

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-22-2004

# Kim v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 02-3589

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Kim v. Atty Gen USA" (2004). *2004 Decisions.* Paper 794.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/794

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 02-3589

SON IL KIM; KYONG HEE KIM,

Petitioners

v.

JOHN ASHCROFT,
ATTORNEY GENERAL OF THE UNITED STATES

On Petition for Review of an Order of Removal from
the Board of Immigration AppealU.S. Department of Justice
Executive Office for Immigration Review
(BIA Nos. A38-668-955, A38-668-956)

Argued: September 16, 2003

Before: McKEE, SMITH, COWEN, <u>Circuit Judges</u>.

(Filed April 22, 2004)

OPINION

Thomas M. Griffin (Argued)
Steven A. Morley
Morley, Surin & Griffin
325 Chestnut Street
Suite 1305-P
Philadelphia, PA  19106
<u>Attorney for Petitioners</u>

Blair T. O'Connor (Argued)
Terri J. Scadron
John M. McAdams, Jr.
Papu Sandhu

Terri Leon-Benner
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

McKEE, Circuit Judge.

Son Il Kim and Kyong Hee Kim petition for review of the Board of Immigration Appeals' ("BIA") order of removal.

**I**

The Kims are natives and citizens of Korea and have two children, a son and a daughter.[1] Prior to leaving Korea, Mr. Kim owned and operated a gas station in a small village several hours outside of Seoul. Mr. Kim is also a high school graduate and a veteran of the Korean Army. In 1984, the Korean government appropriated Mr. Kim's land for public use. He received compensation in the amount of $300,000. Instead of relocating within Korea, he and his family decided to emigrate to the United States. On the advice of a fellow veteran of the Korean army, Mr. Kim visited a travel agency in Seoul to obtain the necessary documentation. He ultimately paid the agency $25,000 and provided it with a copy of his most recent Korean census papers. The agency, in turn, filled out an immigrant visa and alien registration application for Kim. The application contained questions written in both English and Korean. Representatives of the agency

---

[1] The Kims' son is a naturalized United States citizen, and their daughter was granted relief from removal by the same Immigration Judge ("IJ") who presided over their removal proceeding.

-2-

transcribed the answers in English, a language the Kims neither spoke nor read. The application stated that Mr. Kim was the beneficiary of a P4-1 petition (as the married son of a United States citizen) and that his wife was the beneficiary of a P4-2 petition (as the spouse of an alien classified as a P4-1). The application stated that the Kims intended to join Mr. Kim's mother in New York City, and that they were being sponsored by Mr. Kim's sister. However, Mr. Kim did not have any relatives in the United States. Nonetheless, both Mr. and Mrs. Kim signed the application, and the agency provided them with P4-1 and P4-2 visas respectively.

The Kims subsequently entered the United States in January 1985 and eventually settled in the Philadelphia area. Thirteen years later, in 1998, the Immigration and Nationalization Service[2] initiated removal proceedings against the Kims, alleging that they were inadmissible at the time of entry in violation of 8 U.S.C. §1227(a)(1)(A), and that they procured their visas through fraud or willful misrepresentation in violation of § 1182(a)(6)(C)(i). After a hearing on the matter, the IJ found that the Kims were removable on both grounds. He also found that the Kims did not provide credible testimony and therefore lacked the moral character necessary for relief under 8 U.S.C. § 1229b(b).[3] For these reasons, the IJ ordered the Kims removed from the United States.

---

[2] Effective March 1, 2003, the INS ceased to exist, and its interior enforcement functions were transferred to the Department of Homeland Security, Bureau of Immigration and Customs Enforcement. *See* Homeland Security Act, 116 Stat. 2135 Pub. L. 107-296 § 441 (2002).

[3] Section 1229b(b) provides:
(b) Cancellation of removal and adjustment of status for certain nonpermanent residents

The Kims appealed to the BIA, which issued a *per curium* order affirming the IJ's decision without opinion pursuant to 8 C.F.R. § 3.1(a)(7) (2002), thereby making the IJ's decision the final agency determination. *See* 8 C.F.R. § 1003.1(e)(4). The Kims filed this timely petition for review.

II

The Kims raise several issues on appeal and we will deal with each in turn.

## A.    Recusal

First, the Kims assert that the IJ erred by denying their motion to recuse. The motion was based on the fact that the IJ had presided over an earlier removal proceeding against their daughter. Specifically, the Kims argue that the IJ had already made up his mind as to the admissibility of several State Department documents (*see infra* Section IIC), which prevented him from taking a fresh look at the evidence and properly considering their challenges to its admissibility. We review the denial of a recusal motion

---

(1) In general

The Attorney General may cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States if the alien–

(A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application;

(B) has been a person of good moral character during such period;

(C) has not been convicted of an offense under section 1182(a)(2), 1227(a)(2), 1227(a)(3) of this title (except in a case described in section 1227(a)(7) of this title where the Attorney General exercises discretion to grant a waiver); and

(D) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

for abuse of discretion. *Securacomm Consulting, Inc. v Securacom Inc.*, 224 F.3d 273, 278 (3d Cir. 2000).

Under ordinary circumstances, "an [IJ's] rulings in the same or similar cases do not . . . form a basis upon which to allege bias." *Matter of Exame*, 18 I. & N. 303, 306 (BIA 1982). As the BIA noted in *Exame*:

> As a general rule, in order to warrant a finding that an immigration judge is disqualified from hearing a case it must be demonstrated that the immigration judge had a personal, rather than judicial, bias stemming from an 'extrajudicial' source which resulted in an opinion on the merits on some basis other than what the immigration judge learned from his participation in the case. An exception to the general rule that bias must stem from an 'extrajudicial' source may arise where 'such pervasive bias and prejudice is shown by otherwise judicial conduct as would constitute bias against a party.'

*Id.* (citations omitted). In this case, there are no allegations of extrajudicial or personal bias. Moreover, there is no evidence of "pervasive bias and prejudice" arising out of the IJ's judicial conduct. In fact, during the hearing, the IJ listened to the objections made by the Kims' counsel, but ultimately found that the evidence was admissible. Although we find that the IJ's ruling was incorrect in this instance (*see infra* Section IIC), that conclusion can not be interpreted as suggesting that the IJ harbored any bias against the Kims. Accordingly, we conclude that the IJ did not abuse his discretion in denying the recusal motion.

**B. Statute of Limitation**

For the first time in this petition, the Kims also assert that the government is time barred from instituting removal proceedings against them pursuant to 8 U.S.C. § 1256(a), which provides, in relevant part:

> If, at any time *within five years* after the status of a person has been otherwise adjusted under the provisions of section 1255 or 1259 of this title or any other provision of law to that of an alien lawfully admitted for permanent residence, it shall appear to the satisfaction of the Attorney General that the person was not in fact eligible for such adjustment of status, the Attorney General shall rescind the action taken granting an adjustment of status to such person and cancelling removal in the case of such person if that occurred and the person shall thereupon be subject to all provisions of this chapter to the same extent as if the adjustment of status had not been made. Nothing in this subsection shall require the Attorney General to rescind the alien's status prior to commencement of procedures to remove the alien under section 1229a of this title, and an order of removal issued by an immigration judge shall be sufficient to rescind the alien's status.

(emphasis added). Before addressing the merits of the Kims' claim, we must first determine our own jurisdiction. Ordinarily, "if a petitioner wishes to preserve an issue for appeal, he must first raise it in the proper administrative forum." *Tejeda-Mata v. INS*, 626 F.2d 721, 726 (9th Cir. 1980) (citations omitted). While there is a limited exception for constitutional due process claims that cannot be resolved at the administrative level, "[d]ue process is not a talismanic term which guarantees review in this court of procedural errors correctable by the administrative tribunal." *Marrero v. INS*, 990 F.2d 772, 778 (3d Cir. 1990) (citations and internal quotation marks omitted). As the Ninth Circuit Court of Appeals noted in *Liu v. Waters*, 55 F.3d 421, 426 (9th Cir. 1995): "If the

exhaustion requirement is to serve its purpose, we must not allow the exception for constitutional questions to swallow the rule. The key is to distinguish the procedural errors, constitutional or otherwise, that are correctable by the administrative tribunal from those that lie outside the BIA's ken."

In this case, although the Kims argue that their statute of limitation claim raises due process concerns, there is no question that the issue could have initially been raised and resolved at the administrative level. In *Bamidele v. INS,* 99 F.3d 557 (3d Cir. 1996), the petitioner entered the country legally as a non-immigrant visitor. He subsequently participated in a sham marriage and, on that basis, was granted an adjustment of status to that of lawful permanent resident. More than five years thereafter, the INS initiated deportation proceedings against the petitioner based on the fraudulent marriage. Following a hearing on the matter, an immigration judge ordered the petitioner deported, and the decision was upheld by the BIA. The petitioner then sought review in this court, and for the first time raised a statute of limitation claim under § 1256(a). We initially remanded the case, in part, because the issue of the applicability of the limitation period "had not [been] fully briefed and considered by the [BIA]." *Id.* at 560. Upon remand, the BIA determined that the five-year limitation for recession of adjustment of status under § 1256(a) did not preclude initiation of deportation proceedings, and the petitioner again sought appellate review. Because he had exhausted his administrative remedies at that point, we were able to consider the merits of his claim and ultimately determined that the

limitation period did in fact prohibit the INS from initiating deportation proceedings based exclusively on fraud in obtaining an adjustment of status.

This case, of course, poses a significantly different question than the one raised in *Bamidele*. Unlike the petitioner in *Bamidele*, the Kims did not obtain an adjustment of status; rather, they are charged with being inadmissible at the time of entry. Therefore, the outcome of this case is not mandated by our prior decision. Although we may ultimately disagree with the BIA's interpretation of § 1256(a), as we did in *Bamidele*, the issue is not properly before us, and we will not usurp the agency's authority by considering the issue in the first instance. Therefore, we will remand the case to the BIA for a determination of the applicability of the five-year limitation.

## C.     Evidentiary Rulings

The Kims challenge the admission of two pieces of evidence submitted by the Government, which they contend were unauthenticated and unreliable. First, the Kims object to the admission of a November 23, 1994 letter from John H. Good, the acting official in charge of the United States Embassy in Seoul, Korea. The Good letter describes a "visa scam" operating out of the Embassy in the mid-1980s. The letter goes on to explain:

> A variation of the scam involved the cancellation of an immigrant visa by [a Foreign Service National] employee, informing the U.S. Consular Officer of such cancellation (explaining that the visa had been typed incorrectly or perhaps had been mangled in the printing process) and would record such in the immigration log book. However, unless the U.S. officer physically cancelled the visa, the FSN employee

> would then deliver the document to an immigration agency
> who would 'issue' the 'cancelled' visa to their client.

Reply Brief, Appendix. The letter states that this scheme was used to procure the fraudulent visas provided to the Kims. The second piece of evidence is a faxed copy of a March 6, 1998 letter from Robert H. Seibold of the Immigration Visa Branch, Consular Section, American Embassy, Seoul, Korea. The letter indicates that the visa numbers assigned to the Kims were invalid. A page from the Embassy log book is attached to the faxed letter. The IJ admitted both pieces of evidence with little discussion, simply stating that the Good letter was on "government stationary" (A.R. 221)[4] and that both documents were "communiques from the United States Embassy." A.R. 215. Whether these documents were properly admitted is a question of law, which we review *de novo*. *Valansi v. Ashcroft*, 278 F.3d 203, 207 (3d Cir. 2002).

We begin with the general premise that the Federal Rules of Evidence do not apply in the immigration context. Rather, "[t]he test for admissibility of evidence . . . is whether the evidence is probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law." *Ezeagwuna v Ashcroft*, 325 F.3d 396, 405 (3d Cir. 2003) (citations and internal quotation marks omitted). "Therefore, our analysis as to whether an individual's constitutional rights are violated turns on whether the evidence considered by the BIA is reliable and trustworthy." *Id.* On several occasions we have held that State Department letters, such as the ones submitted here, cannot sustain an

---

[4] The Seibold letter was also on government letterhead.

adverse decision by the BIA. *Li Wu Lin v. INS*, 238 F.3d 239, 246 (3d Cir. 2001) ("[T]he Board's decisions cannot be sustained simply by invoking the State Department's authority."); *Ezeagwuna*, 325 F.3d at 407 (same). As we noted in *Li Wu Lin*, the procedural safeguards ensured by appellate review "would be destroyed if the [BIA] could justify its decisions simply by invoking assertions by the State Department that themselves provide no means for evaluating their validity." 238 F.3d at 426.

This case demonstrates the problematic nature of unsubstantiated State Department letters. As an initial matter, we cannot verify the scope of Messrs. Good and Seibold's duties, how they obtained the information communicated in their respective letters, or whether their sources were reliable. For that matter, we cannot even confirm that they actually authored or approved the letters. These are fundamental issues that go to the heart of the letters' reliability and trustworthiness. Such fundamental questions can not be resolved simply by relying on the fact that the letters are on State Department letterhead.[5] Therefore, we find that the Good and Seibold letters are inadmissable, and the IJ should not have relied upon them.[6]

### D. Credibility Determination

---

[5] The log book entry attached to the Seibold letter is even more problematic because there is no indication as to the source of the document or its author.

[6] We are also concerned about the probative value of the two letters. Even assuming their validity, they do not indicate that the Kims were part of, or even aware of, the fraudulent scheme being perpetrated by FSN employees. Thus, it is unclear how the letters even relate to the claim of fraud against the Kims who dealt only with the Korean travel agency.

Credibility findings must be supported by substantial evidence. *Balasubramanrim v. INS*, 143 F.3d 157, 161 (3d Cir. 1998). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . ." *N.L.R.B. v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939) (citation and internal quotation marks omitted). In other words, "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary . . . ." 8 U.S.C. § 1252(b)(4)(B).

In this case, the IJ found that both Mr. and Mrs. Kim failed to provide credible testimony and therefore lacked the moral character necessary for relief under 8 U.S.C. § 1229b(b).[7] In order to fully appreciate the credibility determinations of the IJ, it is necessary to quote his opinion in some detail. The IJ explained his adverse credibility ruling as follows:

> The male respondent is an intelligent man. He is a high
> school graduate, a former soldier, and a businessman who
> owned a gas station. It is not plausible to the Court that he
> would not investigate the possibility of coming to the United
> States and inquire into the way of legally entering this
> country. It is not credible to the Court when he tells me that
> he put all of his faith and trust as well as 25,000 dollars in the

---

[7] There is no question that the Kims' visas were fraudulent, because they were based on a falsity (*i.e.*, that they had United States citizen relatives petitioning for their admission). Thus, the Kims were inadmissible at the time of entry, which makes them removable under 8 U.S.C. §1227(a)(1)(A). The question in dispute is whether the couple made willful misrepresentations, which also make them removable under § 1182(a)(6)(C)(i). If they are removable based on the latter provision, they would be ineligible for relief under § 1229b(b).

hands of a travel agent which was recommended to him by an army buddy.

It only makes sense that an individual such as respondent would want to know how this travel agency he was utilizing was going to proceed on his behalf in return for the 25,000 dollars paid to them. Moreover, I would imagine that the respondent would be suspicious that such a large amount of money would be required to emigrate to the United States, if, indeed, he had no idea that what he was about to embark on was illegal. His testimony that he knew nothing about how to come to the United States is dubious. His testimony that he made no attempt to find out about the proper method of coming here other than by contacting a travel agent is even more in doubt.

The Court finds that the respondent's testimony that he did not read the printed warning written in Korean language before signing the visa application is implausible. The respondent, after all, was a businessman and surely would not sign documents without first reading them. If he had read the warning about false and misleading statements, it is reasonable to believe [that] he would have someone in the travel agency review the document with him to make sure that the contents were correct. It is not plausible to the Court that the respondent would not have reviewed the portion of the application which he could read in Korean. This is a document which he was to sign and whose preparation [cost] 25,000 United States Dollars, a substantial sum today in the United States and even a more substantial sum in Korea in the year 1984.

Had the respondent reviewed his application, he surely would have noted that there were names filled in in response to Questions 16 and 17. He would likewise have read in Korean that these questions relate to who he was going to join in the United States and who had petitioned for [him]. This should have led to questions from the respondent as to what answers were filled in in response to these questions.

A.R. 108-10. Although the IJ's reasoning satisfies the substantial evidence standard with respect to Mr. Kim, it is woefully inadequate insofar as supporting an adverse credibility ruling as to Mrs. Kim. In contrast to the detailed reasons specified for disbelieving Mr. Kim, the IJ's rejection of Mrs. Kim's testimony is cursory in the extreme. The IJ simply states: "The respondent's wife basically testified the same as her husband had testified." A.R. 105.

We would have trouble with dismissing Mrs. Kim's testimony in such a summary fashion even if the summary were an accurate description of Mrs. Kim's testimony. However, the IJ's rationale for ruling against Mrs. Kim is even more tenuous. The explanation is simply wrong. The IJ either completely ignores her testimony or simply misstates it.

Mrs. Kim's testimony is certainly not "the same as her husband's" as the IJ declares. Mrs. Kim testified that she did not know how much her husband paid for the visas until he testified at the hearing, because she was not involved with the family's finances. This directly undermines one the IJ's primary reasons for doubting the Kims' credibility: the fact that a substantial amount of money was paid for the visas, which, according to the IJ, should have triggered some suspicion as to the legality of the documents. In addition, the IJ failed to take into account cross-cultural differences that may explain Mrs. Kim's limited knowledge of the circumstances under which the family's visas were obtained. *See Perez-Alvarez v. INS*, 857 F.2d 23, 24-25(1st Cir. 1988); *Chouchkov v. INS*, 220 F.3d 1077, 1083 n. 15 (9th Cir. 2000). Specifically, Mrs.

-13-

Kim testified that in Korea, when a man does something, his wife does not question his actions. On its face, that testimony can hardly be characterized as incredible or surprising. Yet, the IJ merely rejected Mrs. Kim's testimony because he had reason to disbelieve her husband. The IJ did this without so much as considering Mrs. Kim's description of the male-dominated culture of South Korea. We therefore find that the IJ's rejection of Mrs. Kim's credibility is not supported by substantial evidence on this record, and we will remand the case for a credibility finding as to Mrs. Kim.

The IJ's inquiry into her credibility will, of course, give appropriate consideration to any factual and cultural circumstances surrounding her involvement in obtaining her visa. Moreover, the IJ must separately determine her eligibility for relief under § 1229b(b).[8]

### III

Based on the foregoing analysis, we will remand the Kims' petition to the BIA for a determination as to the applicability of the five-year limitation period under 8 U.S.C. § 1256(a) and an individualized inquiry into Mrs. Kim's credibility. With respect to the latter, the Board must "provide a comprehensible reason for its decision sufficient for us to conduct our review and be assured that [Mrs. Kim's] case received individualized attention," and inquiry. *Paramasamy v Ashcroft*, 205 F.3d 1047, 1050-01 (9th Cir. 2002)

---

[8] Although we are remanding Mr. Kim's petition on the statute of limitation issue, we will also stay the initiation of any removal proceedings against him pending completion of all proceedings against Mrs. Kim. Our purpose in doing so is to allow Mr. Kim to apply for any relief that he may be eligible for as a result of the outcome of his wife's rehearing.

(internal quotation marks omitted). It is, of course, exceedingly important that the inquiry not be affected by any subliminal residual taint from Mr. Kim's testimony. Therefore, although "[w]e recognize that the assignment of an immigration judge is within the province of the Attorney General," *id*., at 1055, n.4, we strongly recommend that Mrs. Kim's hearing on remand will be reassigned to a different IJ. "The parties would be far better served by the assignment to those proceedings of a different IJ." *Id.* (internal quotation marks omitted).